**UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND**

| | |
|---|---|
| IN RE MUTUAL FUNDS INVESTMENT LITIGATION ) | MDL 1586 |
| ) | |
| IN RE ALGER, COLUMBIA, JANUS, MFS, ) | Track No. 04-MD-15863 |
| ONE GROUP, PUTNAM, AND ALLIANZ DRESDNER ) | (Judge J. Frederick Motz) |
| ) | |
| PAULA BEALS, individually and on ) | |
| behalf of all others similarly situated, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Cause No. 1:05-CV-01086-JFM |
| ) | |
| THE VARIABLE ANNUITY LIFE ) | Class Action |
| INSURANCE COMPANY, ) | |
| ) | Jury Trial Demanded |
| Defendant. ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff PAUL BEALS, individually and on behalf of others similarly situated, states as follows for her First Amended Complaint against THE VARIABLE ANNUITY LIFE INSURANCE COMPANY ("VALIC"):

**THE PARTIES**

1. Plaintiff Paula Beals is a resident of Edwardsville, Illinois, in Madison County.

2. At all times relevant to this Complaint, Plaintiff owned a VALIC Tax-Sheltered Annuity.

3. VALIC is an Texas corporation with its principal place of business in Houston, Texas.

4. VALIC maintains investor relationships with clients in Madison County, Illinois, communicates regularly with them by mail and maintains an interactive website to communicate with clients, including clients in Madison County.

5. The transactions which are the subject of this Complaint occurred in part in Madison County, Illinois.

1

## VALIC'S VARIABLE ANNUITY FUNDS

6. People invest in variable annuities for the same reasons people invest in mutual funds: their investment is pooled with those of thousands of other investors thereby achieving economies of scale that investors could not otherwise enjoy individually. For instance, investors can be collectively invested in a far more richly diversified portfolio of securities than they would be able to invest in individually; collectively they enjoy the benefits of professional management of their funds (such as investment research and daily monitoring of markets and securities) for a miniscule fraction of the cost they would pay individually because the costs are spread among thousands of investors; and, because large blocks of securities are traded on behalf of thousands of investors, trading transactional costs are vastly reduced because the transactional costs for the single "collective investor" are also spread among the thousands of actual investors invested in the fund. In addition, investors in variable annuities enjoy tax deferment on their investment, as well as a death benefit.

7. The VALIC annuities which are the subject of this Complaint consist of a "separate account" in which VALIC keeps investors' assets separate from VALIC's own assets.

8. Investors' funds in the separate account are the property of the investors and not the property of VALIC.

9. Each annuity's separate account is further divided into multiple sub-accounts, each of which corresponds to a single mutual fund.

10. Investors' funds in the sub-accounts are the property of the investors and not the property of VALIC.

11. VALIC invests the investors' funds in each sub-account in that sub-account's corresponding mutual fund. These mutual funds are maintained exclusively for variable annuity or variable life insurance products, although they often bear names very similar to those of retail mutual funds.

12. Because the funds in the sub-accounts are investors' funds, when VALIC invests those funds in a mutual fund, the investors are the real owners of the shares of the mutual fund which VALIC only nominally holds in its name on behalf of and for the benefit of the investors.

13. VALIC credits each investor with "units" of the sub-accounts in which the investor's funds are invested.

14. Units in VALIC's sub-accounts can be traded, either by purchase or redemption, only once per day at 4:00 p.m. Eastern Time.

15. VALIC establishes a new daily "unit value" (UV) for each sub-account once every trading day at the close of trading on the New York Stock Exchange at 4:00 p.m. Eastern Time.

16. At the end of each trading day, VALIC (either directly or through a fund manager) valuates the assets in each mutual fund and establishes a "net asset value" for each mutual fund. That net asset value is the same net asset value VALIC uses to establish the corresponding sub-account's daily UV.

17. The two factors which have the largest influence on the UV are the value of the mutual fund portfolio and the total number of investors invested in that mutual fund (*i.e.*, the total number of investors who hold units in the sub-account which corresponds to any given mutual fund).

18. Because the sub-accounts' UV's are based upon the per share value of the underlying mutual fund, the value of an investor's sub-account units will fluctuate as the value of the corresponding mutual fund fluctuates.

19. VALIC contracts with fund managers who manage the mutual funds in which VALIC invests sub-account funds.

20. The fund managers handle the day-to-day tasks associated with managing an investment portfolio, such as investment management and valuation of the mutual fund's underlying portfolio of securities.

## VALIC'S SUB-ACCOUNTS' CORRESPONDING
## MUTUAL FUNDS' PORTFOLIOS INCLUDE FOREIGN SECURITIES

21. Some of the mutual funds in which the annuity sub-accounts are invested include in their portfolios securities which are traded in markets outside of the United States.

22. In valuing the assets of a mutual fund, the fund manager uses the last trade price in the home market of each of the securities in its portfolio. The home markets for the foreign securities include London, Paris, Frankfurt, Moscow, Singapore, Kuala Lumpur, Hong Kong, Taipei, Tokyo and/or Sydney. These markets are located in time zones that are five to fifteen hours ahead of Eastern Time.

23. Thus, a five to fifteen hour interval elapses between the close of the foreign securities markets and VALIC's calculation of its sub-accounts' UV's.

24. For example, the exchange located in Tokyo, Japan observes normal trading hours of 9:00 a.m. to 3:00 p.m. local time. Active trading of securities traded on this exchange ends, and closing prices for those securities are posted, at 3:00 p.m. local time (2:00 a.m. Eastern time). When VALIC or its fund managers calculate the value of the mutual funds' portfolios, it uses any Japanese securities' closing prices in the Tokyo exchange. Thus, when VALIC calculates its sub-accounts UV's based upon the mutual fund valuation, VALIC necessarily incorporates the closing prices on the Tokyo exchange for any Japanese securities, closing prices that have been static for 14 hours.

25. Studies of world financial markets have established associations between the value changes among various markets. There is a positive correlation between value movements in the U.S. markets and value movements in foreign markets. If the U.S. markets experience an upward movement in values, it can be predicted that foreign markets will move upward once trading begins the next day. Similarly, if the U.S. markets experience a downward movement in values, it can be predicted that foreign markets will move downward once trading begins the next day.

26. Studies also demonstrate that the greater the percentage increase or decrease in the value of U.S. markets, the more likely foreign markets will post corresponding value movements on the subsequent trading day. The probability that the value movements of foreign markets will follow the

previous day's value movements in U.S. markets is directly correlated to the degree or extent of the value movement of U.S. markets.

## VALIC'S MISMANAGEMENT
## EXPOSES INVESTORS TO MARKET TIMING

27. A significant portion of the underlying securities in the mutual fund portfolios associated with the VALIC sub-accounts are listed on foreign exchanges and trade during each market's respective session.

28. When VALIC or its fund managers establish the share values of the mutual funds in which VALIC invests the sub-accounts' funds, they do not take into account on a daily basis any price relevant information (such as such as value movements in the U.S. markets, changes in world equity market indices, changes in the value of American Depository Receipts (ADRs), and fluctuations in foreign currency futures markets) that has become available in the interval between the close of the foreign markets and the calculation of the mutual funds' share values.

29. Such price relevant information is significant because the final market prices of the foreign securities often have become stale because they no longer reflect the current market value of the securities.

30. When the foreign securities prices are stale, VALIC's (or its fund managers') use of such stale prices of the foreign securities to calculate the UV causes the UV to be either artificially high or artificially low.

31. VALIC's calculation of artificially high or artificially low UV's exposed existing sub-account holders to market timing traders who regularly purchase and redeem units of VALIC's sub-accounts as part of a profitable, stale-price trading strategy.

32. Market timing is a short-term trading strategy by which the market timing trader takes advantage of the artificially low or high UV's. Because VALIC uses stale pricing of foreign securities to calculate mutual fund share values and thus sub-account UV's, market timers are able to predict

5

changes in the UV's based on events that occur after the close of foreign securities markets but before the U.S. markets close.

33. Market timers buy units of VALIC sub-accounts on days when the U.S. markets move up, and they redeem units when the U.S. markets move down.

34. Due to VALIC's use of stale pricing, anyone who buys VALIC's sub-account units on days when the U.S. markets move up are buying units whose prices are artificially low, irrespective of whether the purchaser intends to market time. Similarly, anyone who redeems VALIC's sub-account units on days when the U.S. markets move down are redeeming units whose prices are artificially high, irrespective of whether the purchaser intends to market time.

## VALIC'S FAILURE TO PROHIBIT MARKET TIMING DILUTES HOLDERS' OWNERSHIP INTERESTS

35. Every purchase of VALIC sub-account units at an artificially low UV dilutes the ownership interests of all existing sub-account holders because the purchaser acquires a larger percentage of ownership interest of the sub-account than the purchaser would have acquired had VALIC not used stale prices of foreign securities to calculate the UV.

36. Similarly, every redemption of VALIC sub-account units at an artificially high UV dilutes the ownership interests of all other existing sub-account holders because the redeemer depletes sub-account assets more than they would have been depleted had VALIC not used stale prices of foreign securities to calculate the UV.

37. VALIC's use of stale prices of foreign securities to calculate the UV does not, in and of itself, injure sub-account holders. Indeed, VALIC's methodology for calculating the UV could, at least theoretically, sometimes benefit holders to the extent that someone purchases units at an artificially high UV or someone redeems units at an artificially low UV. Moreover, if no trading occurs on a day when the UV is artificially high or artificially low, holders are not injured.

38. Thus, it is VALIC's failure to prohibit purchases of sub-account units at an artificially low UV and redemptions of sub-account units at an artificially high UV which injures existing holders of sub-account units.

39. The wealth represented by market timing dilution comes exclusively and dollar-for-dollar out of the pockets of existing holders of sub-account units.

## PLAINTIFF AND CLASS MEMBERS HAVE NO FEDERAL SECURITIES LAW CLAIM

40. Stale price trading in VALIC annuity sub-accounts does not materially benefit VALIC, its directors, officers or employees.

41. With respect to market timing or stale price trading in its annuities' sub-accounts, VALIC did not make any untrue statement or fail to disclose any material fact in connection with Plaintiff's or class members' purchases or sales of such annuities or purchases or sales of units in VALIC's annuities' sub-accounts.

42. With respect to market timing or stale price trading in its annuities' sub-accounts, VALIC did not use or employ any manipulative or deceptive device or contrivance in connection with Plaintiff's or class members' purchases or sales of such annuities or purchases or sales of units in VALIC's annuities' sub-accounts.

43. No purchaser of VALIC's sub-account units is injured, in connection with his purchase, by any other purchaser's purchase of sub-account units at an artificially low UV.

44. No purchaser of VALIC's sub-account units is injured, in connection with his purchase, by any other trader's redemption of sub-account units at an artificially high UV.

45. No seller of VALIC's sub-account units is injured, in connection with the redemption of his sub-account units, by a purchaser's purchase of sub-account units at an artificially low UV.

46. No seller of VALIC's sub-account units is injured, in connection with the redemption of his sub-account units, by any other trader's redemption of sub-account units at an artificially high UV.

47. As a result, stale price trading does not injure purchasers or sellers of VALIC's sub-account units.

48. Accordingly, because VALIC, with respect to market timing or stale price trading in its annuities' sub-accounts, did not make an untrue statement, fail to disclose any material fact or use or employ any manipulative or deceptive device or contrivance in connection with Plaintiff's or class members' purchases or sales of such annuities or purchases or sales of units in VALIC's annuities' sub-accounts Plaintiff and class members have no cause of action under federal securities law.

**STALE PRICE TRADING DOES NOT INJURE VALIC
AND IS THEREFORE NOT A SHAREHOLDERS' DERIVATIVE CLAIM**

49. Market timing and stale price trading dilutes the value of investors' pooled investment in VALIC sub-accounts which, as alleged above, are the separate property of the investors and not the property of VALIC.

50. Market timing and stale price trading does not injure VALIC or its property.

51. As a result, the dilution that occurs through market timing and stale price trading injures shareholders directly.

52. Accordingly, Plaintiff brings this suit for mismanagement against VALIC as a direct action and not as a shareholders' derivative action.

**CLASS ACTION ALLEGATIONS**

53. Through her ownership of the VALIC Tax-Sheltered Annuity, Plaintiff at all times relevant to this Complaint held units in the Putnam Global Equities Variable Investment Option sub-account for the purpose of long-term investment.

54. Plaintiff brings this class action on behalf of herself and on behalf of a class of all persons in the United States who held (through their ownership of an VALIC annuity or insurance products) units of any VALIC sub-account invested in mutual funds which included foreign securities in their portfolios and which experienced market timing or stale price trading activity.

     i. Excluded from the class are VALIC and any of its parent, subsidiary or affiliated corporations, as well as any of their controlled persons, officers, directors, agents, servants or employees, and the immediate family members of any such person; any judge who may preside over this case; all persons who have claims in excess of $75,000; and any investor who engaged in market timing trading in the VALIC sub-accounts which are the subject of this Complaint.

     ii. Excluded from this Complaint are any claims Plaintiff or any class member may have based upon VALIC's conduct in connection with Plaintiff's or any class member's purchase or sale of any VALIC annuity or insurance products.

55. Alternatively, if VALIC is found, with respect to market timing or stale price trading in its annuities' sub-accounts, to have made any untrue statement, failed to disclose any material fact, or used or employed any manipulative or deceptive device or contrivance, Plaintiff brings this class action on behalf of herself and on behalf of a class of all persons in the United States who, prior to VALIC's untrue statement, omission of material fact, use or employment of any manipulative or deceptive device or contrivance, held (through their ownership of an VALIC annuity or insurance products) units of any VALIC sub-account invested in mutual funds which included foreign securities in their portfolios and which experienced market timing trading activity.

     i. Excluded from the class are VALIC and any of its parent, subsidiary or affiliated corporations, as well as any of their controlled persons, officers, directors, agents, servants or employees, and the immediate family members of any such person; any judge who may preside over this case; all persons who have claims in excess of $75,000; and any investor who engaged in market timing trading in the VALIC sub-accounts which are the subject of this Complaint.

     ii. Excluded from this Complaint are any claims Plaintiff or any class member may have with respect to any purchase or sale of any VALIC annuity or insurance products after VALIC's untrue statement, omission of material fact, or use or employment of any manipulative or deceptive device or contrivance.

     iii. Also excluded from the class is any person whose only purchases of any VALIC annuity or insurance products all occurred after VALIC's untrue statement, omission of material fact, or use or employment of any manipulative or deceptive device or contrivance.

     iv. Also excluded from this Complaint are any other claims Plaintiff or any class member may have based upon VALIC's conduct in connection with Plaintiff's or any class member's purchase or sale of any VALIC annuity or insurance products.

56. Plaintiff is a member of the class and will fairly and adequately assert and protect the interests of the class. Plaintiff's interests are coincident with, and not antagonistic to, those of other class members.

57. Plaintiff has retained attorneys who are experienced in class action litigation.

58. Members of the class are so numerous and geographically dispersed that joinder of all members is impracticable. While Plaintiff cannot ascertain the exact number and identity of class members prior to discovery, on information and belief, there are thousands of class members and their identity can be ascertained from VALIC's books and records.

59. There are questions of law or fact common to the class, and Plaintiff's claims are typical of those of class members.

60. Those common questions predominate over any questions affecting only individual members of the class.

61. Those predominating, common questions include, but are not limited to, the following:

   i.   whether in calculating daily UV's VALIC negligently failed to evaluate on a daily basis price relevant information available after the close of the exchanges in which the securities held by the mutual funds' portfolios trade, but before the calculation of the daily UV, which was likely to change the value of the mutual fund securities and thus sub-account UV's;

   ii.  whether in calculating daily UV's VALIC negligently failed to implement valuation and pricing policies and procedures which would account for price relevant events occurring after the close of the exchanges in which the securities held by the mutual funds' portfolios trade, but before the calculation of the daily UV, whenever closing prices of mutual fund portfolio securities did not reflect their current market values;

   iii. whether VALIC negligently failed to protect its sub-account holders from market timing or stale price trading;

   iv.  whether Plaintiff and the class have sustained damages as a result of VALIC's negligence; and/or

   v.   the proper measure of any such damages.

62. The prosecution of separate actions by individual members of the class would create a risk of:

   i.   inconsistent or varying adjudications with respect to individual members of the class; and/or

      ii.    adjudication with the respect to individual members of the class, which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication or substantially impair or impede their ability to protest their interest.

63. The class action method is appropriate for the fair and efficient prosecution of this action.

64. Individual litigation of all claims, which might be brought by all class members, would produce a multiplicity of cases so that the judicial system would be congested for years. Class treatment, by contrast, provides a manageable means of bringing to rapid conclusion the claims of all persons with whom Plaintiff is similarly situated with respect to VALIC's negligence as alleged herein.

### COUNT I
### (COMMON LAW NEGLIGENCE)

65. Plaintiff repeats and incorporates by reference paragraphs 1 through 64 as if fully set forth here.

66. As a specialist in the field of investment management, it became VALIC's duty to exercise that degree of knowledge, skill and care ordinarily used, or which should be used, by reasonably well-qualified members of the investment management profession, including but not limited to the duties:

      i.    to use mutual fund share values predicated upon current market values when valuing sub-accounts and setting their daily UV's; and/or

      ii.    to prevent market timing and/or stale price trading in sub-accounts to prevent the dilution of the ownership interests of existing sub-account holders.

67. VALIC knew or should have known that the closing prices for the foreign securities held in its sub-accounts' corresponding mutual funds' portfolios did not represent current market values of those foreign securities whenever price relevant events had occurred after the closing of foreign securities markets but before VALIC's calculation of daily UV's.

68. VALIC was negligent in one or more of the following ways:

      i.    failing to evaluate on a daily basis price relevant information available to VALIC after the close of foreign securities markets in which the underlying mutual funds' portfolios of securities traded;

      ii.    failing to adjust calculation of daily UV's to take into account any changes in value of the foreign securities held in the underlying mutual funds' portfolios whenever price relevant events occurred after the closing of the foreign securities markets but before VALIC's calculation of daily UV's; and/or

      iii.    failing to implement policies and procedures which would protect sub-account holders such as Plaintiff and class members from the dilution effect of market timing and/or stale price trading.

69. As a direct and proximate result of VALIC's negligence, Plaintiff and the class have suffered damages in an amount to be proven at trial, but less than $75,000 per plaintiff or class member, including all compensatory damages and costs.

WHEREFORE, Plaintiff requests that the Court certify this action as a class action, enter judgment in favor of Plaintiff and the class and against Defendant THE VARIABLE ANNUITY LIFE INSURANCE COMPANY, and award Plaintiff and the class compensatory damages, prejudgment interest and costs of suit in an amount not to exceed $75,000 per plaintiff or class member. Plaintiff demands a trial by jury.

    s/ Robert L. King
Robert L. King
701 Market Street, Suite 350
St. Louis, MO 63101
Phone: (314) 621-4012
Fax: (314) 621-2586
E-mail: king@swedlowking.com


KOREIN TILLERY LLC
GEORGE A. ZELCS
205 North Michigan Plaza
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9750
Fax: (312) 641-9751
E-mail: gzelcs@koreintillery.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that service of the foregoing document was made by means of the Notice of Electronic Filing on June 24, 2006 to the following counsel of record:

**Daniel M. Lane, Jr.**
**David A. Jones**
**Joseph L. Sorkin**
Akin, Gump et al.
300 Convent Street, Suite 1500
San Antonio, TX 78205

                                              s/ Robert L. King
                                              Robert L. King